Thank you and may it please the court. This case and this appeal all come down to the word comparable. Interpretation of the applicable regulations which require comparability is clear. The district court erred in its interpretation of the comparability requirements for three things. Wheelchair The first of these is the lack of comparable sightlines where the district court only applied one part of the two part standard from the DOJ's accessible stadiums guidance. We all know what it's like to go to a major league baseball game. It's about the sights, the sounds, the experience. The primary reason for going to the game is to experience what is taking place on the field. While important, wheelchair users like our clients do not primarily care about convenient access to amenities. As the bellies of argued, you can access all of those things from the comforts of your own home. Just like everyone else, they care most about the game. You would not pay for a ticket to only be able to see half of the infield during exciting moments. Most of the important action happens in the infield. Would you go to a game if you could not ever see a place at first play at first base or home plate? If, as our exhibits show, wheelchair users can only see a portion of the infield and standing spectators directly in front of them can see home plate during exciting moments. That is clearly not comparable. Can I ask you a question? You're so my understanding is that you agree that the accessible stadium standard applies. Is that right? Yes, Your Honor, the parties do not dispute the applicable rule is the two part standard from that document. So isn't the trouble here that the accessible stadium standard while trying to give some level of specificity to this comparability concept doesn't actually tell us what the site has to be for folks who are in an ADA seat versus someone who is in a non-ADA seat. So the accessible stadium simply tells us that they have to have a view of the playing field. And arguably based on the expert evidence that was presented here, everyone in the seats that we're talking about in this case had a view of the playing field. So how is accessible stadiums not being met? Sure, I'm happy to clarify that, Your Honor. And so turning to the accessible stadiums document here, it requires that wheelchair seating locations must provide lines of sight that are comparable to those provided to other spectators. And what it says about that is that wheelchair users are to be provided a choice of admission prices and views that are comparable to those of the general public, as well as its additional requirements of accessible seating being integral part of the seating plan. And it further clarifies that by saying a comparable line of sight allows a wheelchair user to see the playing surface between the heads and over the shoulders of people one row in front, and then over the heads of persons two rows in front. And that's the piece right there that I'm struggling with, because accessible stadiums seems to attempt to define what comparable means. And it gives us that two part test. It says you just have to be able to see the playing field through through the like you said, through the above the shoulders of the people right in front of you and over the heads of the people two rows. So the photos and exhibits that the experts submitted suggest that that's true. You can see the playing field, you may not have the same view of the playing field as other people, but you can see the playing field. And I'm just struggling with what inaccessible stadiums tells me that that a view that of the playing field that is different is a violation. Sure, so I can try to clarify that further, Runner. So it really all just comes down to the word comparable. And so systematically throughout the 100 level, as well as the 200 level, wheelchair accessible seating has an inferior view of the field. And so you can't see third base or home plate when there's an exciting moment, whereas standing spectators can. Well, let me ask you, I mean, narrowing in on what Judge Hunsinger is asking about. It seems that if you take this two level process, the people in the row just in your expert agreed that the one level in front of you is between the between the shoulders is okay. Is that correct? Over the shoulders? Yes. Over the shoulders. Yeah. Between however, I can't see through the shoulders. But Sure. And in that case, I take it you would say that Mr. Terry and Mr. Endelman are not in conflict. Is that right? Yes, Your Honor for that limited premise. Yes. Okay. And then as I read Mr. Terry's testimony, when you're looking at someone that's two rows down from you, you need to look over the head of those people. Is that correct? For your view? That is correct, Your Honor. And that's what that's where the experts differ. Okay. And the way that the district court made her conclusion, she said that Mr. Endelman testified that the accessible seats are roughly comparable or comport with the diagram provided. So she made that finding. And then she made the finding, as you say, in the first part like the first row down. Did the district court actually make a finding in your view with respect to this over the head for the people who are two rows down? Your Honor, from my recollection, they did not because they were only applying the first part of the two part standard. And what would be given the timing of the stadium? Let's just say that for talking purposes that this, you know, the disbursement of seats and the ticket pricing and all that were blessed as they were by the district court. But we're left with that one point about the seats. Would that need to go back to the district court for clarification? Or what would be the remedy if you are correct on that? No, Your Honor, could you please clarify exactly what you mean by which part you're talking about there? Just the if the only issue at the end of the day, were the individuals two rows down and the over the head from the diagrams of the accessible stadium. If that were the only issue and there appeared to be a conflict not resolved by the district court, what would be the remedy you would want from this court? Yes, Your Honor. Thank you for clarifying. We would want this court to vacate and remand because it is a legal question, which would be subject to de novo review. And I actually forgot to mention, I did want to reserve some time for rebuttal. Now would probably be a good time. Yes. Thank you. All right. Thank you. Right. My understanding is that there will be a split of the argument here between Mr. Wiley and Mr. Hylas. Is that correct? No, Your Honor. It's between myself and Mr. Hylas. Oh, I'm sorry. I misunderstood that. So Mr. Wiley and Mr. Okay. Mr. Reynolds and Mr. Hylas. You may proceed. Please the court. Steve Woolley representing the appellees. The issue here is the central regulation in this case is limited and nonspecific in the first instance. In fact, Supreme Court recently identified it as an illustrative, ambiguous regulation and the subsequent guidance has been limited and skeletal. I want to start here and talk about the sightline and the seating distribution issues. And I'm happy to follow up on any particular questions in court. There's no real dispute about the relevant guidance. The question is, what does it mean and what does it require? And in this respect, the district court wrestled with the applicable regulations in the law and came up with firm and conclusive decisions. Number one, the court did apply the two-part test from accessible stadiums. The court stated that in order to comply with the 1991 standard and section 4.33.3 therein, sightlines at T-Mobile Park must provide wheelchair users a view of the playing surface between the heads and shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front. That's a two-part test. And then the court said further viewing the evidence submitted at trial, the park accomplishes this task. That is ER33 at lines 12 through 17. So to recap, the court used the two-part test and it made a finding the stadium complied. So how could the court make that finding in view of Mr. Terry's testimony with respect to the two rows down? I think the court found Mr. Terry's testimony to be inconsistent. If you look at the examples identified in our briefing, Mr. Terry had great difficulty identifying what was comparable. For example, if there was a delta in sightlines of 10%, that was okay. 12% he was maybe in some circumstances, he could not identify what the parameters of comparability were. And what the district court did was to look at Mr. Edelman's testimony in which he applied the drawing from the accessible stadiums 1996 document and use that in comparison with actual identified seats and sections in the complaint at the stadium and found that those compared. And what Mr. Edelman said is, look, had I been engaged in 1996 to go I would have done a as-designed assessment and I would have done an as-built assessment. And in both circumstances, I would have looked at what was done here and I determined that it complied with the scant guidance provided by accessible stadiums. And one of the ways you know this is, is you can look at SER 133 through 136, which are pictures of how the platforms were that is what the stadium is constructed as, it's what the architects did in compliance with the applicable regulations. And what is happening here is we have an effort to rewrite those regulations. I mean, didn't your expert also testify at trial that so long as somebody in an ADA seat could see the turf on the outfield, that's enough. So even if they couldn't see any of the playing area, as long as they could see some piece of the field that met the standards. Isn't that what he testified to? I think he testified to that effect, but I think he's getting at the issue of use the playing surface. And that raises the question of what the scope of playing surface is. You have to see 100% of the field, you have to see the sidelines, you have to see the dugouts, and you have to see them all the time. And this is exactly the issue that comes up in Mr. Terry's testimony. So we asked him at trial, you know, what is the part you're looking at? He said that the infield is important, home plate is important, but you want to see outfields important. He could not identify what part of the field you have to see all of it, some of it, it varies. And that raises the problem in that what we're looking at here is a regulation does not provide either a performance specification, or excuse me, a design specification or a performance standard. And by way of example, I guess I want to push you on that a little bit. Is it your position that accessible stadiums only requires that somebody in an ADA seat see the field, any portion of the field, and that's good enough, accessible stadiums is met? Is that your position? No, it's not, Your Honor. I believe the position is exactly what accessible stadiums says, is that you need to be able to see a comparable line of sight to the playing surface. And the question, the $64 question is, what does that comparability mean in context, in the course of looking at seats all around a stadium that have different views? And so the expert, Mr. Terry, had some evidence that was put in the record. I can't remember if it's Exhibit D or Attachment D that gave percentages of different amounts of view from various places in the stadium. What is your position on what the district court did with that? I mean, I'm waiting the district court position, and it almost seems like she ignored that. Like, I don't see her addressing that or explaining why that wasn't compelling. What is your explanation there? I don't know precisely what the district court thought of Mr. Terry's testimony, Your Honor, because it's not clearly detailed in her findings of fact and conclusions of law. My feeling was the district court was reasonably skeptical of the testimony, given that Mr. Terry was unable to articulate what the degree of comparability was. There were, for example, some seats in which, depending upon certain views, you had a less expansive view of a non-accessible seat than an accessible seat. And he talked about, well, he wanted to be able to see the infield closer, and then he tried to explain why there were different levels within the rows. But I think what the problem is, is he is trying to create a very specific performance standard. And yet, at the end of the day, he's unable to articulate what parameters that standard would look like. And I think the court may well have been leery of trying to is maybe akin to Judge Hunsinger, it's because the court seems to be mixing and matching to a degree. So at ER 34, the court talks about Mr. Terry's illustrations and says, well, what can be And I think that both experts appear to agree that's true if you're looking at the people just in front of you and not two rows down. So how does that testimony comport with Mr. Terry's testimony? Because I don't see the court as rejecting Mr. Terry. No, I guess I don't see the court rejecting Mr. Terry's testimony. I see the court accepting that Mr. Imbleman's testimony is what is required and shows compliance. Right. But if that testimony is at odds with someone else's testimony, another expert who was not rejected either because of the way he analyzed it or credibility or some reason, then we do seem to have a conflict in the testimony here without an explanation as to why Mr. Imbleman would be accepted. Well, there are two things going on, I believe, Your Honor. Number one is what is the mode of analysis and the framework for analysis in the first instance? And I think that the court is accepting that Mr. Imbleman's approach is the line 7 through 16. Yes. So I think what the court, look, I'm trying to put myself in the court's mind here. But what the court appears to be saying is that when she is looking, Judge Rothstein is looking at the illustrations, she is finding those to be comparable. And she is looking in particular, for example, at certain exhibits, identifying the shoulder line and others looking at finding a view close to 100%. She is then making a finding that her view, Judge Rothstein concludes that when taking into account the percentage of the field, one can be seen utilizing the standard of the sight lines are comparable. I'm unable to explain further what the court thought other than what is stated in the opinion here and is examining Mr. Imbleman's views. If the court has any further questions on the sight line issue, I would like to move on to receiving distribution. It appears no other questions on sight lines. The question of receiving distribution raises the same sort of issue in that we have the regulation requiring comparability. And receiving distribution, I think it's clear under the section 4.33.3, as well as the technical assistance manuals, and the subsequent accessible stadiums all embody a general dispersal requirement. But the issue is, what does that dispersal requirement mean? Is there a mathematical formula? Is there some sort of proportional homogeneity? Is there an analysis by section or level? Or is it a holistic view of the stadium? And I think that the law is quite clear that the holistic view is the way to approach it, that you are intended to avoid nosebleed clustering or poor seats only in the end zones. And if you look at the evidence here, you will see, for example, ER62 is the diagram which shows the location of accessible seating within the stadium. You have uncontested horizontal distribution around the stadium. You have seats available in front row in the 100 level, in the back row of 100 level, in the 200 level, and in the 300 level. And in this case, the plaintiffs and the appellants are not seeking to challenge distribution horizontally. They concede that's adequate. They're not trying to challenge distribution vertically within the 200 level or the 300 level. And in fact, they're focusing on the 100 level, but really only front half 100 level. And so this kind of narrow geographic scope yields, I think, an improper analysis. What you see is that park offers accessible seating in each tier, each level, that accessible seating is in place along every accessible path that egress within the stadium, that all accessible seating is placed near and proximate to concessions, restrooms, and exits and entrances. There is no bunching of the seating in a high tier, not all seats are in the 300 level, for example, not all seats are in the end zone, or only in the outfield. You can rather find a whole variety of accessible seats throughout the stadium. And the plaintiff's request for relief focuses on a divvying up of accessible seats between the front half 100 level and the back half 100 level. And what they're really getting at is they want more seats in the front half 100 level. And while I understand the desire, I'm not aware of there being any support in the case law for this mandate. I want to quickly discuss ticket pricing. Ticket pricing, the argument that are being made by appellants is a work in progress. It was previously framed up as a comparability driving from section 4.33.3, that is there had been comparable ticket pricing. It now appears that the plaintiffs or appellants are arguing that there needs to be accessible seating in every single pricing level at the stadium. And I'm not aware of there being any law that supports that. And to the contrary, I think what you see is that A, the evidence here as wheelchair users have access to the same sales categories and tickets, season tickets, group sales, individual game sales, that the price of an accessible seat is never higher. It's always as low as any nearby non-accessible seat. And wheelchair users have a wide range of ticket prices. In this respect, SER 131 is a exhibit which shows the range of accessible ticket prices for seats at a specific game in September of 2019. It showed a range of seats from $15 to $17 to $75. We also know that there are front row seats with Diamond Club access or Premier Club access, which are as high as $500. You have a wide range of ticket prices. And the court said, this range is a result of the fact that there is sufficient vertical and horizontal distribution of the park, so as to create pricing differentials among accessible seats comparable to the non-accessible seats. That's ER 48, lines 17 to 19. What the appellants seek to have this court do is to, in effect, rewrite a regulation and to include material new detail requirements. And then they want the court to hold that clarified regulation should be applied retroactively. And then to reverse the district court's factual findings and remand for it to deal with the clarified regulation. Many courts have noted that a better and clearer regulation here would be beneficial, but we would submit it is not this court's province to write a regulation where the DOJ has failed to do so. It also creates new process issues. What was an architect in 1997 supposed to do? What could he or she have known and acted on at that time? And the Department of Justice itself, as evidenced by the LRB Beckett case, has recognized that prospective enforcement is the only fair approach. I believe my time is concluded for no further questions. It appears not. Mr. Heinles, I think there was some miscommunication between the clerk and myself about your time, but you have five minutes on your clock. And I think Mr. Reynolds still had about a minute and a half. Thank you, Your Honor. David Heinles of Munger, Tolles, and Olson on behalf of Amakai. Your Honor, I want to address a few points here today. First, 96% of the accessible seats in the 100th bevel of T-Mobile Park are in the back. Only 4%, only eight seats in total, are in the front. That means that the vast majority, the buy-in share, as the district court acknowledged, wheelchair users are forced to sit in the back. That is not the full and gravely concerned about the implications of a decision that blesses this arrangement. Deduction 4.33.3 is not complicated. It's about integration and equality. It was enacted expressly to fix the longstanding problems of disabled fans being delegated to segregated seating in the public arenas. As Congress expressly found that segregation isolated disabled people from public life. The whole point then of this seating dispersion standard is to give people with disabilities as close to an equal experience as possible so that they can enjoy the game with means with respect to seating dispersion is that there must not be isolation or segregation. It also means that providing mere token seats in good locations isn't sufficient to give wheelchair users the genuinely comparable experience of enjoying the game that everybody else has. 4.33.3 has an exception though for areas that have a higher slope greater than 5%. So what are we to make of that exception with everything else you're saying? Well, first of all, it's my understanding that plaintiffs argue that that exception only applies where the sight lines are equal and the sight lines aren't equal here. But more fundamentally, the clustering exception cannot under the ADA swallow the rule and allow a stadium to put all the seats in the back simply because the grade is higher than 5% as that would violate the fundamental dictates of what this standard is designed for. Briefly, I want to also address this sight lines point because I know that that has come up. The sight line standard is also based on a qualitative comparison between what wheelchair users can see and what everybody else can see. Indeed, the Ninth Circuit has expressly discussed the standard in the context of sight lines in recognizing that the standard has broad purpose and demands more than an analysis of what obstructions are in the way, but rather a comparison between options available to wheelchair users and options available to everybody else. That case is Oregon Paralyzed Veterans 339 F3D 1126. Here, claims presented evidence that as can be seen at ER 794, that wheelchair users can see significantly less of the field than everybody else. Attorneys argue here that the seating dispersion is efficient simply because there are seats on every level of the stadium. But the seating sense comparison about which seats are better. Indeed, as we said more than a brief, the Department of Justice has made clear that venue operators understand which seats are better. Here, the better seats are almost exclusively reserved for non-disabled patrons. I see that my time is up. I just want to say that the ADA requires a full and equal experience. The legislative and regulatory history of this section make clear that this requires a comparative analysis to make sure that wheelchair users have the same options as everybody else. Here, the stadium does not provide that and so the panel should vacate the lower court's decision. Thank you. Thank you, Mr. Hylas. Mr. Randolphson. Thank you. Appellees have noticed in the design phase of the stadium that sightlines overstanding spectators was indeed a reasonable interpretation of Section 4.33.3 as endorsed by the DOJ under Miller. The 1994 TAM supplement as well as the May 1996 accessible stadiums guidance was before construction of the stadium, which began in March 8th, 1997 and was also available during the design phase, which began in 1996. Quoting from Independent Living, if standard 4.33.3 requires arena operators to provide wheelchair users with sightlines overstanding spectators as the DOJ intends, then that has been the law ever since July 26th, 1991 and the stadium was subject to this requirement. Under Roblace, the Constitution only requires that an entity receive fair notice of its legal duties and not a blueprint for compliance with the statutory obligations. And so the ADA, also Roblace quoting Reed v. CVS, the ADA and its implementing regulations are intended to give public accommodations maximum flexibility in meeting the statute's requirements. This flexibility is a feature and not a bug. Today we ask you to further cement the precedent from Miller for assembly areas in a way that aligns with both the spirit and the plain text of the ADA. These standards may be contested both previously and in this case, but they have always been clear. Thank you. Thank you. I'd like to thank both council for the parties for your argument and briefing also to Amici for your participation today. The case of Landis v. the Washington State NLB Stadium Public Facilities District is submitted. Our next case for argument will be Merchant v. Corazon.
judges: McKeown, Hunsaker, Bumatay